**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON**

**CIVIL ACTION NO. 13-212-DLB-JGW**

**BERTHA MAE HUFF and JAMES HAROLD HUFF**                      **PLAINTIFFS**

vs.                 **<u>MEMORANDUM OPINION AND ORDER</u>**

**CAROL SPAW**                                                                       **DEFENDANT**

\*\*\*    \*\*\*    \*\*\*    \*\*\*

**I.    Introduction**

This case arises from an all-too-familiar and embarrassing situation that most individuals with cell phones have experienced at some point: the "pocket" or "butt" dial. James Huff inadvertently called—or "pocket dialed"—Carol Spaw while he was on a business trip in Italy. Unbeknownst to Mr. Huff, Ms. Spaw listened in for 91 minutes to face-to-face conversations that Mr. Huff had with a colleague and his wife. Ms. Spaw recorded and transcribed a portion of those conversations. James and Bertha Huff have now accused Carol Spaw of surreptitiously intercepting their private conversations in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968.

Title III of the Act creates a private right of action for those whose communications have been unlawfully intercepted. But the private right of action is only available to those who were engaged in "wire, oral, or electronic communications" as each term is defined by the statute. 18 U.S.C. § 2520(a). As fully explained below, the private right of action created by Title III is not available to Mr. and Mrs. Huff under the facts of this case because

1

they were not engaged in any of the protected forms of communication. If anything, they were engaged in an "oral communication" as that term is generally understood. But Title III does not protect every oral communication; it only prohibits the interception of oral communications "that were uttered with an expectation that such communication is not subject to interception under circumstances justifying such expectation" 18 U.S.C. § 2510(a). As explained herein, Mr. and Mrs. Huff did not have a reasonable expectation of privacy that there face-to-face conversations would not be overheard by Ms. Spaw via Mr. Huff's pocket dial phone call. Therefore, Mr. and Mrs. Huff were not engaged in a type of communication protected by Title III.

This novel issue comes to the Court by way of Plaintiffs' Motion for Temporary Retraining Order and Preliminary Injunction (Doc. # 2), which has been fully briefed (Docs. # 13, 27). One of the factors the Court must consider in ruling on this motion is whether Plaintiffs are likely to succeed on the merits of their case. At oral argument, the parties agreed that if the Court concludes Plaintiffs are not likely to succeed on the merits—and, in fact, cannot prevail as a matter of law—then summary judgment pursuant to Rule 56(f), Federal Rules of Civil Procedure, would be appropriate. Because the Court finds that Plaintiffs do not have a viable cause of action against Defendant under Title III, the Court will **deny** Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction and **grant Judgment** in favor of Defendant on the federal claims.

**II. Factual Background**

In late October 2013, Plaintiffs James and Bertha Huff attended a conference in Bologna, Italy. They were accompanied by Larry Savage, a colleague of Mr. Huff, and Mr. Savage's wife. Mr. Huff and Mr. Savage attended the conference as representatives of the

Kenton County Airport Board, which oversees the operations of the Cincinnati/Northern Kentucky International Airport ("CVG"). Mr. Huff serves as Chairman of the Board; Mr. Savage serves as Vice-Chairman.

On the evening of October 23, 2013, Defendant Carol Spaw sent Mr. Huff an e-mail inquiring whether he planned to attend a dinner engagement in Italy the following evening. This was a typical task for Ms. Spaw, and in fact part of her job duties. Ms. Spaw is employed as Senior Executive Assistant to the Chief Executive Officer of CVG, Ms. Candace McGraw, as well as liaison to the Kenton County Airport Board. In that role, one of her many tasks is to make travel arrangements for board members.

During a break in the conference the following day, Huff and Savage left the conference room and found a quiet, outdoor balcony so that they could discuss Airport personnel matters, including the continued employment of Ms. McGraw. However, before diving into their discussion, Huff made sure that nobody was around to overhear what they were saying. He ensured that the door to the balcony was closed, and that no one was standing in the courtyard below.

At the outset of the conversation, the two discussed whether they would attend the business event later that evening. Agreeing that they would both attend, Huff attempted to call Spaw via his iPhone. He was unsuccessful in reaching her though, apparently because he mis-dialed her number by one digit. Not knowing why the call failed to go through, Mr. Huff placed his cell phone back in the breast pocket of his suit. Savage then successfully reached Ms. Spaw . He had a short conversation with her and confirmed that he and his wife, along with Mr. and Mrs. Huff, planned to attend the dinner engagement later that evening. Savage and Spaw hung up their respective phones at the conclusion

3

of their conversation.

Shortly thereafter, Huff placed the now infamous "pocket dial" to Spaw's office phone at the Airport. Spaw answered the phone and could immediately hear Huff and Savage talking in the background, although she could not make out what they were saying. Spaw said "hello" at least six times within the first minute of the call but neither Huff or Savage responded.

When neither Huff or Savage responded, Spaw placed the call on speaker phone to try to hear what they were saying. She said "hello" several more times, but again heard no response. Spaw then enlisted the help of Nancy Hill, another CVG employee, to help determine what Huff and Savage were discussing. Within the first minute and a half of the phone call, Spaw and Hill determined that Huff and Savage were discussing CEO Candace McGraw's employment. Spaw instructed Hill to take down notes of what she heard.

Approximately forty-one (41) minutes into the phone call, Spaw could tell that Huff and Savage's conversation had come to an end and that they had returned to the conference room. At her deposition, she all but agreed that she did not expect Huff or Savage to engage her in conversation at this point. Instead, she explained that she remained on the line because she felt she needed to document what she perceived as inappropriate behavior. Specifically, she felt that Huff and Savage were plotting to take discriminatory action against McGraw, and possibly violate the Board's code of conduct and criminal law. She intended to remain on the line to hear if Huff and Savage made any other potentially damning remarks.

The conference ended approximately one hour and ten minutes into the call. By this point, Spaw had acquired a recording device from the Airport's IT department so that she

4

could record any conversations she deemed relevant.  Spaw listened in as Huff and Savage left the conference room and walked back to their respective hotel rooms.  Along the way, Spaw heard Huff and Savage talk about completely innocuous subjects such as gospel music, taking a nap and meeting in the lobby later in the evening.  Spaw, however, remained on the line hoping to hear additional damning conversations.

Approximately one hour and fifteen minutes into the call, Huff returned to his hotel room where his wife, Bertha, was waiting for him.  Alone in their hotel room, the husband and wife talked about innocent things like all couples do.  But Mr. Huff also shared with his wife many of the details about his conversation with Savage earlier in the day, including details about Airport personnel matters.   Eight-seven minutes into the call, Spaw used the recording device provided by the IT department to record the final four minutes of the Huffs' conversation.

Resting up from a long day, the Huffs laid down on their hotel bed and continued their conversation.  They continued to discuss airport personnel matters and McGraw, and Spaw continued to record what she overheard.  While on the bed, Mr. Huff looked at his cell phone and realized that it had an open call with Spaw's office phone.  He initially thought the call had been open for a minute and twenty-nine seconds, but later realized that the call had actually lasted one hour and twenty-nine minutes to this point.  Mr. Huff testified that he immediately hung up the call.  However, cell phone records indicate that the call lasted one hour and thirty-one minutes, suggesting that he left the call open for an additional two minutes after first noticing it.

Once the phone call had concluded, Spaw took the handwritten notes and converted them into a typewritten transcript of the conversation.  The parties agree that the transcript

5

is nothing close to a verbatim recitation of the conversations, but more akin to a summary with intermittent quotations. Spaw also uploaded the audio recording onto her office computer, and later uploaded the recording onto a thumb drive so that it could be transferred to a third-party company to enhance the audio. Both the transcript and audio recording were eventually shared with members of the Board.

On December 3, 2013, the Huffs filed a Verified Complaint (Doc. # 1) alleging, *inter alia*, that Spaw violated various provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968. Specifically, they assert that Spaw: (1) intentionally intercepted their private face-to-face conversations in violation of 18 U.S.C. § 2511(1)(a); (2) intentionally disclosed the contents of their private face-to-face conversations knowing that they had been unlawfully intercepted in violation of 18 U.S.C. § 2511(1)©; and (3) intentionally used the contents of their private face-to-face conversations knowing that they had been unlawfully intercepted in violation of 18 U.S.C. § 2511(1)(d). They seek a declaratory judgment that Spaw violated each of these provisions of the Act, as well as monetary damages and attorney's fees as provided by 18 U.S.C. § 2520(b).

Before diving into the merits of the Huffs' claims an additional fact must be noted: the Huffs knew that pocket dials are relatively common in the age of smart phones. In fact, Mrs. Huff admitted during her deposition that she has pocket dialed people "many times." (Doc. # 20 at 10). Mr. Huff was not quite as forthcoming in his deposition about placing previous pocket dials, but he eventually admitted, "I'm certain I have [pocket dialed people] . . . " and that he "believed" he had placed previous pocket dials. (Doc. # 21 at 23 and 24). However, Mr. and Mrs. Huff testified that they expect the recipient of a pocket dial call to hang up once they discover they were inadvertently called.

### III. Standard of Review

As previously stated, this matter is presently before the Court on Plaintiff's Motion for a Preliminary Injunction. It is purely within the discretion of this Court to grant such a motion, although the Sixth Circuit has instructed district courts to consider four factors in doing so:

(1) Whether the plaintiff has shown a strong or substantial likelihood or probability of success on the merits;

(2) Whether the plaintiff has shown irreparable injury;

(3) Whether the issuance of a preliminary injunction would cause substantial harm to others;

(4) Whether the public interest would be served by issuing a preliminary injunction.

*Welch v. Brown*, – F. App'x –, 2014 WL 25641, at *4 (6th Cir. Jan. 3, 2014) (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)). "These factors are to be balanced, not prerequisites that must be met." *Id.*

It is possible that a plaintiff may be entitled to a preliminary injunction even when he has failed to show he is likely to succeed on the merits. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). However, this result would only be appropriate where the plaintiff has at least shown "serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *Id.* (quoting *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). As will be explained below, Plaintiffs have not demonstrated a substantial likelihood of success on the merits, nor have they shown "serious questions to the merits."

For these reasons, Plaintiffs are not entitled to a Preliminary Injunction.

Moreover, based on the undisputed facts in the record, Plaintiffs' federal claims are entirely devoid of merit. At oral argument, the Court advised the parties pursuant to Rule 56(f) that because the factual record was developed, it might be possible for the Court to finally resolve the merits of this matter under Rule 56(a). Under that standard—the summary judgment standard—the Court may enter summary judgment if there are no genuine issues of material fact and one of the parties is entitled to judgment as a matter of law. For the reasons set forth below, Defendants are entitled to judgment as a matter of law on Plaintiffs' claims under Title III of the Omnibus Crime Control and Safe Streets Act of 1968.

**IV. Analysis**

**A. Title III of the Omnibus Crime Control and Safe Streets Act of 1968**

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("the Act") was enacted with the primary purpose of providing more effective means for combating organized crime in the United States. *United States v. Underhill*, 813 F.2d 105, 110 (6th Cir. 1987). To achieve this end, the Act provides a detailed procedure by which the Attorney General or his designee may seek authorization from a Federal judge to intercept wire, oral and electronic communications. *See* 18 U.S.C. § 2516. The Act also includes rigid requirements that must be met in carrying out the interception. *See* 18 U.S.C. § 2516-19. But with all of its detailed procedures and requirements, one thing is clear: the Act is intended "to make electronic surveillance available as a tool of law enforcement," *Underhill*, 813 F.2d at 110, while also protecting the privacy of certain types of communications.

The Act also serves a second purpose: "to prohibit any authorized interception of" certain communications. Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 801, 82 Stat. 197 (1986). Specifically, the law makes it unlawful to "intentionally intercept ... any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). "Intercept" is defined as the "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

But the Act goes further than limiting interception. It also prohibits the intentional disclosure "to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of [the Act]." 18 U.S.C. § 2511©. Similarly, the Act prohibits the intentional "use" of "the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of [the Act]." 18 U.S.C. § 2511(d).

The Act adds teeth to its prohibitions by providing wronged parties with a private right of action against those that have violated the Act. Specifically, § 2520 provides:

> Except as provided in section 2511(2)(a)(ii), any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity which engaged in that violation such relief as may be appropriate.

18 U.S.C. § 2520(a). Plaintiffs rely on this private right of action in bringing their federal claims.

### B. Is the private right of action provided by 18 U.S.C. § 2520(a) available to Plaintiffs?

The parties' briefing has largely addressed two issues: (1) whether Defendant violated any of the prohibitions codified at 18 U.S.C. § 2511 and (2) whether Defendant's alleged interception, use and distribution of Plaintiffs' private conversations was lawful because she was a party to the communication. *See* 18 U.S.C. § 2511(2)(d). But as the Court notified the parties in advance of oral argument, a threshold issue must be considered before the Court delves into whether Defendant has violated the Act. That is, the Court must first determine whether the private right of action provided by 18 U.S.C. § 2520(a) is even available to Plaintiffs.

At first blush, the answer to this question appears simple. Of course the private right of action is available to Plaintiffs, one might say. After all, Plaintiffs were engaged in face-to-face conversations, and Defendant listened in to those conversations via telephone. That has to qualify as an "oral communication" between Plaintiffs and Savage that was "intercepted" by Defendant. But this question—whether the private right of action is available to Plaintiffs—becomes more complicated, and in fact dispositive, when the text of the statute is analyzed.

The Act only protects against the interception of "wire, oral, or electronic communications" as those terms are defined by statute. *In re Askin*, 47 F.3d 100, 102 (4th Cir. 1995) (citing *United States v. Smith*, 978 F.2d 171, 175 (5th Cir. 1992), *cert. denied*, 507 U.S. 999 (1993)). At oral argument, Plaintiffs categorized their face-to-face conversations as both "oral" and "wire" communications. Specifically, Plaintiffs posit that the first approximately 87 minutes of their face-to-face conversations were "oral

communications" as defined by 18 U.S.C. § 2510(2), and that Defendant intercepted those communications via her office telephone.  However, Plaintiffs believe their communication should be characterized differently once Defendant began recording the call.  At that point, Plaintiffs believe they were having *both* an oral and wire communication as defined by § 2510(1) and (2).  The communications were oral in the sense that they remained face-to-face conversations, and they continued to be intercepted by a land line.  But they were also "wire communications," Plaintiffs suggest, in the sense that face-to-face conversations were transmitted over wire to Defendant's office telephone, and then intercepted by a recording device.

### 1.  Did Plaintiffs engage in an "oral communication"?

The first question, then, is whether Plaintiffs were engaged in an "oral communication" as that term is defined by Title III of the Act.  An "oral communication" is:

> any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception *under circumstances justifying such expectation*, but such term does not include any electronic communication.

18 U.S.C. § 2510(2) (emphasis added).

As the statute makes clear, Congress did not intend to protect every oral communication as that term is generally understood.  Rather, Congress only protects oral communications to the extent that the participants have both (1) a subjective expectation that their conversation will not be intercepted and (2) that expectation is objectively reasonable.  *Dorris v. Absher*, 179 F.3d 420, 425 (6th Cir. 1999).  This analysis requires more than a determination about whether Plaintiffs generally expected their conversations to remain private.  Rather, it calls the Court to specifically consider whether the Plaintiffs

had a subjective, and objectively reasonable, expectation that their conversations were not being intercepted by electronic devices. *Boddie v. American B'dcasting Cos.*, 731 F.2d 333, 338-39 (6th Cir. 1984). As the Sixth Circuit has recognized, "there 'may be some circumstances where a person does not have an expectation of total privacy, but still would be protected by the statute because he was not aware of the specific nature of another's invasion of his privacy.'" *Id.* at 339 n. 5 (quoting *Bianco v. American B'dcasting Cos.*, 470 F. Supp. 182, 185 (N.D. Ill. 1979)).

Plaintiffs unquestionably did not expect that their face-to-face conversations would be intercepted.[1] The very nature of their conversations compels this conclusion. Certainly Plaintiffs and Savage would not have openly discussed private Airport personnel matters, including possibly replacing the CEO, knowing that others might be listening. Moreover, their actions showed that they did not intend others to overhear or intercept their conversations. A significant portion of the intercepted communications took place in two places: a private balcony and a hotel bedroom. Mr. Huff was alone with Savage on the balcony, and ensured that no one was around before discussing personnel issues. Similarly, Mr. Huff was alone with his wife in their hotel room when he recounted his previous conversation with Savage. Under these circumstances, Plaintiffs clearly expected that their conversations would remain private and free from interception.

The question, though, is whether Plaintiffs' expectation was objectively reasonable or one that society is willing to recognize as legitimate. *See Dorris*, 179 F.3d at 425. To

---

[1] Plaintiffs cite a six-factor test used by the Fifth Circuit to determine whether an individual has a subjective expectation that his communication will not be intercepted. *Kee v. City of Rowlett*, 247 F.3d 206, 211 (5th Cir. 2011). It does not appear that the Sixth Circuit has adopted this or any similar test. In any event, the Court need not determine whether the test would be used in this Circuit because it is abudantly clear that Plaintiffs had a subjective expectation that their conversations would not be intercepted.

answer this question it is imperative to more precisely define the expectation at issue. The Court would be answering a question far too broad if it analyzed whether Plaintiffs had a reasonable expectation that their conversations would not be intercepted as that term is generally understood. After all, "intercept" connotes some form of surreptitious third-party conduct. Here, the question is whether it was objectively reasonable for Plaintiffs to expect that Defendant would not answer the inadvertently placed phone call, remain on the line and listen to Plaintiffs' face-to-face conversations, and record a small portion of the call.

The Court concludes that society is not prepared to recognize Plaintiffs' expectation as reasonable or legitimate. At their depositions, both Plaintiffs agreed that they had placed "pocket dial" calls from their cell phones in the past. Additionally, Mr. Huff knew that he was carrying his cell phone; he had just hung it up and placed it in his pocket when he began the conversations at-issue in this case. Thus, he knew he was carrying a device that was capable of giving a third party audible access to his conversations without him ever knowing. Knowing that, it is unreasonable for him to expect that anything he says while carrying that device will remain free from interception as it was done here.

Society has come to accept the fact that people often place inadvertent calls from their cell phones. This fact has become so well accepted that society has given the technological annoyance a name: the "pocket" or "butt" dial. *See* Pocket-Dial, http://www.urbandictionary.com/define.php?term=pocket+dial (last visited Jan. 24, 2014) ("When a person's cell phone . . . located in a pocket accidentally dials someone, unbeknownst to the person carrying it. The recipient of the call usually receives a very annoying, long and potentially incriminating message."). And society recognizes the consequences of a pocket dial. The online encyclopedia, Wikipedia.com, states that "[t]he

caller is frequently unaware that the call has taken place, whereas the recipient of the call often hears background conversations and background noises . . . Due to dialing of common numbers, the *recipient is likely to know the caller, and may overhear conversations that the caller would not want them to hear.*" Pocket Dialing, http://en.wikipedia.org/wiki/Pocket_dial (last visited Jan. 24, 2014) (emphasis added). That is exactly what happened here. Because society recognizes that this is a consequence of carrying a cell phone, the Court simply disagrees with Plaintiffs that they had an objectively reasonable expectation that Defendant would not listen in to their face-to-face conversations.

But what about the fact that Defendant listened for ninety-one (91) minutes and recorded the last four minutes of the call? Plaintiffs emphasize each of these facts. They agree there was nothing wrong with Defendant answering the pocket dial. But they take issue with the fact that Defendant remained on the line for so long even though Mr. Huff never engaged her in conversation. Plaintiffs believe society is willing to recognize that it is reasonable to expect a recipient of a pocket dial to hang up once she discovers that the call was inadvertently placed. The Court disagrees. While it may be polite for the recipient to hang up once she discovers she has actually received a pocket dial, it is not reasonable to expect everyone to do so. If an individual wants to keep his conversations private, the onus is on him to do so. He cannot give another person access to his conversation and then put the burden on that individual to determine that she should take no part in it. Therefore, the court finds that Plaintiffs' expectation of non-interception was unreasonable here.

Plaintiffs cite two cases to support their assertion that it was unreasonable for Defendant to remain on the line, neither of which are persuasive. *See Watkins v. L.M. Berry & Co.*, 704 F.2d 577 (11th Cir. 1983); *Fisher v. Mt. Olive Lutheran Church*, 207 F. Supp. 2d 914 (W.D. Wisc. 2002). Both cases involved a "wire communication"—or telephone conversation between two people—that was intercepted by a coworker. The defendants in each case argued that they were permitted by the "business extension exception" to listen in to the conversations.[2] *See* 18 U.S.C. § 2510(5)(a). The analysis of that exception required, *inter alia*, the courts to determine whether the defendants listened to the calls in the ordinary course of business. In each case, the court concluded that it was in the ordinary course of business for the coworkers to listen for a short period of time, but once they discovered the conversations were personal in nature they were obligated to hang up.

The analysis in *Watkins* and *Fisher* has no application here. Because the courts were concerned with "wire communications", they were not called to consider whether the plaintiffs had objectively reasonable expectations of privacy as they would have done in analyzing an "oral communication." Instead, they addressed an exception—the "business extension exception"—that has no applicability to the present case. Even if the cases did analyze whether the plaintiffs had objectively reasonable expectations of privacy, both cases are factually distinguishable from the present case such that they serve little use. Unlike this case, the plaintiffs in each of those cases did nothing to give the defendants access to their calls. Mr. Huff certainly gave Defendant access to his private conversations

---

[2] In *Watkins*, the defendant also argued that the plaintiff had given consent to monitor phone calls made to and from work phones. The court found that the consent was limited to work-related phone calls, and that the defendant was required to hang up any intercepted call once she leaned it was personal in nature.

here even if it was inadvertent. This is a critical fact to the present dispute.

Plaintiffs also attempt to analogize this case to *Walker v. Darby*, 911 F.2d 1573 (11th Cir. 1990), a case where the Eleventh Circuit found that the plaintiff had an objectively reasonable expectation that his oral communications would not be intercepted. There, the defendant placed an electronic monitoring device at the plaintiff's work station in order to monitor his conversations. *Id.* at 1575. The plaintiff did not know that the monitoring device was present. *Id.* The Eleventh Circuit suggested that the plaintiff might not have had a reasonable expectation that his conversations would remain private because they occurred in an open office space. *Id.* at 1578-79. However, the inquiry under § 2510(2) is different: did the plaintiff have a reasonable expectation of non-interception. *Id.* at 1579. The court held that "while [the plaintiff] might have expected conversations uttered in a normal tone of voice to be overheard by those standing nearby, it is highly unlikely that he would have expected his conversations to be electronically intercepted and monitored in an office in another part of the building." *Id.*

*Walker* is factually distinguishable in two significant ways. First, in *Walker* the defendant surreptitiously placed a recording device in the plaintiff's office space with the purpose of intercepting face-to-face conversations. Defendant did nothing like that here; she simply answered her phone when it rang. Second, and more importantly, the plaintiff in *Walker* had absolutely no knowledge that the monitoring device had been placed at his work station. Here, to the contrary, Mr. Huff knew that he was in possession of a cell phone that was capable of making inadvertent phone calls. Thus, while the plaintiff in *Walker* had no way of knowing that someone from a remote location might be listening in to his face-to-face conversations, Mr. Huff certainly knew that was a possibility if he

16

inadvertently made a pocket dial call.

In the end, it was unreasonable for Plaintiffs to expect that their face-to-face conversations would not be overheard by someone on the other end of a pocket dial phone call. If Plaintiffs expected that their conversations would not be overheard and recorded as they were, they could have done something to prevent it from happening. The easiest measure might have been to simply put the cell phone away while they were having private conversations. Or Mr. Huff could have locked his phone to prevent a pocket dial call. But they did not take those measures, or any other measure, to prevent the inadvertent phone call from being placed. If anyone must bear the brunt of the embarrassing consequences of this pocket dial, it must be the caller; not the recipient who had every right to answer the call and remain on the line.

### 2. Did Plaintiffs engage in a "wire communication"?

In an attempt to avoid the expectation of privacy analysis, Plaintiffs also characterize the last four minutes of their conversation—the portion that was recorded–- as a "wire communication." The Act defines a "wire communication" as:

> [A]ny aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of such connection in a switching station) furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce and such term includes and electronic storage of such communication.

18 U.S.C. § 2510(1). Plaintiffs assert that there was an aural transfer between themselves and Defendant, which was transmitted in part by wire to Defendant's office telephone and then intercepted by Defendant via the recording device.

17

Plaintiffs' application of § 2510(1) to the facts of this case is misguided. The statute requires the Court to first identify the aural transfer's point of origin and point of reception and then determine, *inter alia*, whether the transfer was made in whole or in part "by the aid of wire, cable, or other like connection." *See* 18 U.S.C. § 2510(1). Plaintiffs have identified Defendant's office telephone as the point of reception, which, if true, would make the aural transfer a "wire communication." But Defendant's office telephone was not the point of reception; Mr. and Mrs. Huff, having a face-to-face conversation, were the point of origination and reception. Defendant's office phone was the "electronic, mechanical, or other device" used to intercept Plaintiffs' face-to-face conversation. *See* 18 U.S.C. § 2510(5). The recording device served as an additional device used to enhance the interception of the office phone. Because there was no "oral, cable, or other like connection between" Mr. and Mrs. Huff, their conversation was not a "wire communication" as that term is defined by § 2510(1).

Ultimately, Plaintiffs were not engaged in a type of communication that Congress intended to protect when it passed Title III of the Act. As the Court has determined, Plaintiffs' face-to-face conversations were neither "oral" or "wire" communications as those terms are defined by Title III. Additionally, Plaintiffs have conceded that their communications were not "electronic communications" as defined by 18 U.S.C. § 2510(12). Having failed to establish that they were engaged in a type of communication that is protected by the Act, Plaintiffs cannot bring a cause of action against Defendant under 18 U.S.C. § 2520(a) for any violation of 18 U.S.C. § 2511. Defendants are therefore entitled to judgment as a matter of law on each of Plaintiffs' federal claims.

### C. State Law Claims

Having determined that Defendant is entitled to judgment as a matter of law on Plaintiffs' federal claims, only Kentucky state law claims remain. Specifically, Plaintiffs bring three related claims for unlawful eavesdropping, unlawful disclosure of information obtained through eavesdropping, and unreasonable intrusion upon seclusion. Defendant has also asserted two counterclaims for retaliation in violation of Kentucky statute. The Court's jurisdiction over each of these claims is solely supplemental under 28 U.S.C. § 1367. Pursuant to the discretion provided to this Court by Congress and approved by the Supreme Court, this Court declines to exercise such jurisdiction. 28 U.S.C. § 1367(c)(3); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary.") (citations omitted).

### D. Sealed Documents

At the outset of the case, the Court cautioned the attorneys that any dissemination of the recorded telephone call, or notes taken therefrom, could potentially lead to further civil liability if the Court ultimately found there was an unlawful interception. To their credit, the attorneys took heed of the Court's admonition and have sought the Court's approval to file potentially sensitive documents under seal. The Court has granted several of these motions. But the Court has also made it known that it would revisit whether the documents should be sealed once liability is finally determined.

Having now determined that Plaintiffs cannot bring a cause of action against Defendant under 28 U.S.C. § 2520(a), there is no longer a need to shield any of the documents filed in this case from the public. Thus, all previously sealed documents will be

unsealed. Additionally, all pending motions to file documents under seal (Doc. # 23) will be denied.

## V. Conclusion

Accordingly, for the reasons set forth herein, **IT IS ORDERED** as follows:

(1) Plaintiffs' Motion for Temporary Restraining Order and for Preliminary Injunction (Doc. # 2) is hereby **DENIED**;

(2) Pursuant to Federal Rule of Civil Procedure 56(f), **summary judgment is hereby entered in favor of Defendant on Counts 1, 2, 3, and 4**.

(3) Pursuant to 28 U.S.C. § 1367(c), the state-law claims raised in Counts 5, 6, 7, and 8 are hereby **DISMISSED WITHOUT PREJUDICE**.

(4) Plaintiffs' Motion to File Transcripts Under Seal (Doc. # 23) is hereby **DENIED**;

(5) The Clerk of Court shall **unseal** any sealed document filed in this case;

(6) Plaintiffs' Motion for Extension of Time to File Answer to Counterclaims is hereby **DENIED AS MOOT;** and

(7) A separate Judgment shall be entered contemporaneously herewith.

This 24th day of January, 2014.



Signed By:
David L. Bunning
United States District Judge

G:\DATA\Opinions\Covington\2013\13-212 MOO denying mtn for preliminary injunction and granting judgment in favor of D.wpd